IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

STUART G. ROBINSON                                              PLAINTIFF

              v.                 Civil No. 13-3095

CAROLYN W. COLVIN,[1] Commissioner
Social Security Administration                                    DEFENDANT

**MEMORANDUM OPINION**

Plaintiff, Stuart G. Robinson, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (Commissioner) denying his claim for disability insurance benefits ("DIB") and supplemental security income under Titles II and XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

**I.    Procedural Background**

Plaintiff applied for DIB and SSI on September 30, 2008. (Tr. 138, 242.) Plaintiff alleged an onset date of January 1, 1997 due to Bipolar Disorder, high blood pressure, right shoulder injury with arthritis, arthritis in neck, Hepatitis C, irregular heartbeat and enlarged heart, fibrosis of liver, chronic tuberculosis (now arrested), hiatal hernia, GERD, and drug and alcohol addiction. (Tr. 138, 274-75.)

On April 22, 2010, Administrative Law Judge ("ALJ") Edward Starr rendered an unfavorable decision after conducting a hearing on January 25, 2010. (Tr. 56, 135-37.) Plaintiff was present to testify and was represented by counsel. The ALJ also heard testimony from Lynn Wilburn, a witness for Plaintiff, as well as Vocational Expert (VE) Patricia Kent. (Tr. 56.)

---

[1]Carolyn W. Colvin became the Social Security Commissioner on February 14, 2013. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Carolyn W. Colvin has been substituted for Commissioner Michael J. Astrue as the defendant in this suit.

On November 7, 2011 the Appeals Council ("AC") remanded the case. (Tr. 153.) On remand, the ALJ was to address the following issues: 1) the Plaintiff's date last insured was to be adjusted to June 30, 2006; 2) the ALJ was to address whether the *Martinez v. Astrue* Court Case Settlement Rules applied regarding the fugitive felon issue; 3) the ALJ was to consider escalation of the case to the hearing level; 4) the ALJ should reevaluate claimant's application through the new date last insured; 5) the ALJ should clarify the effect of assessed limitations on the claimant's occupational base using hypothetical questions that reflected the specific capacity as established by the record as a whole. (Tr. 155-56.)

An administrative -hearing was held on May 30, 2012 in front of ALJ Starr. Plaintiff was present to testify and was represented by counsel. The ALJ also heard testimony from Plaintiff's witness Remy Segura and Vocational Expert ("VE") Monty Lumpkin. (Tr. 92.)

At the time of the administrative hearing, Plaintiff was 49 years old, possessed a GED obtained after dropping out of school in the tenth grade, and had completed one year of college. (Tr. 282, 684.) Plaintiff enlisted in the Army for three years active service in 1980, then was four years disabled retired for tuberculosis. He then reenlisted for another three years, and was honorably discharged in 1990. (Tr. 684, 1658.) Plaintiff had past relevant work experience ("PRW") as a truck driver and drywall finisher. (Tr. 147.)

On July 6, 2012, ALJ Starr concluded that Plaintiff suffered from the following severe impairments: osteoarthritis/degenerative joint disease, mood disorder, personality disorder and substance abuse disorder. (Tr. 12.) The ALJ found that Plaintiff maintained the residual functional capacity to

> lift and/or carry 20 pounds occasionally and 10 pounds frequently, sit six hours in an eight-hour workday and stand/walk six hours in an eight-hour workday. In addition, he can only occasionally climb, balance, crawl, kneel, crouch and stoop, and he can frequently do overhead work with his dominant (right) upper extremity. In addition, he can understand, remember and carry out simple, routine and repetitive tasks. He can respond to usual work situations and ordinary work changes and respond to supervision that is simple, direct and concrete. He can occasionally interact with supervisors, coworkers and the general public.

2

(Tr. 16.) With the assistance of the VE, the ALJ determined that the Plaintiff could perform such representative occupations as light unskilled machine tender, with representative samplings of compression molding machine tender, leather riveting machine operator, and bindery machine feeder and off-bearer. Additionally, the ALJ found that Plaintiff could perform the job category of light unskilled production/assembly workers, with representative samplings to include bottling line attendant, toy assembler, and conveyor line bakery worker. (Tr. 21.)

Plaintiff requested a review by the Appeals Council on July 25, 2012. (Tr. 5.) The Appeals Council declined review on August 19, 2013. (Tr. 1.) Plaintiff filed this appeal on October 16, 2014. (ECF. No. 1.) Both parties have filed appeal briefs, and the case is now ready for decision. (ECF Nos. 11, 12.)

**II.     Applicable Law**

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Id*. "Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision." *Id.* As long as there is substantial evidence in the record to support the Commissioner's decision, the court may not reverse the decision simply because substantial evidence exists in the record to support a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). If the court finds it possible "to draw two inconsistent positions from the evidence, and one of those positions represents the Secretary's findings, the court must affirm the decision of the Secretary." *Cox*, 495 F.3d at 617 (internal quotation and alteration omitted).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and

3

that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see* 42 U.S.C. § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months. *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

### III. Discussion

Plaintiff raises one issue on appeal: that the ALJ erred in not engaging in the proper analysis required when substance abuse is a significant factor. (Pl.'s Br. at 11.) Defendant argues that because the ALJ properly found that the Plaintiff was not disabled even with the effects of his substance abuse included, it was not necessary to engage in the two-part substance abuse analysis. (Def.'s Br. at 6.)

Defendant is correct that the ALJ must only engage in the substance abuse analysis "[i]f the gross total of claimant's limitations, including the effects of substance abuse, suffices to show disability." *Brueggman v. Barnhart*, 348 F.3d 689, 694 (8th Cir. 2003.) However, review of a decision of this nature

4

necessarily requires the Court to determine if the underlying determination of "no disability" is supported by substantial evidence.

The ALJ found that "[t]he claimant's mental symptoms would not interfere with completion of a normal workweek." (Tr. 20. ) The ALJ did not clearly label his reasons for discrediting Plaintiff's mental impairment allegations. Based on the facts summarized in his opinion, it appears that he discredited Plaintiff because he was not following treatment advice, could work when he followed treatment, and that Plaintiff's multiple inpatient mental hospitalizations were primarily the result of malingering to obtain shelter. (Tr. 19-20.)

This Court is troubled by inaccuracies and incomplete analysis in several points of this credibility analysis, as well as the lack of a valid Mental RFC evaluation from a medical professional. Taken together, these issues render the ALJ's opinion unsupported by substantial evidence. *See Draper v. Barnhart*, 425 F.3d 1127, 1130 (8th Cir. 2005.)("inaccuracies, incomplete analyses, and unresolved conflicts of evidence can serve as a basis for remand.")

### A. The ALJ Failed to Address the Extent To Which Plaintiff's Medication Non-Compliance Was a Manifestation of his Bipolar Disorder

Although not explicitly stated as such, the ALJ appears to have discredited Plaintiff's complaints for failure to follow prescribed treatment. Specifically, ALJ noted that:

> the record reflects the claimant has a longstanding history of mood disorder (bipolar disorder and/or substance induced mood disorder) treated with mood stabilizer and antipsychotic medications as well as polysubstance abuse/dependence and has had multiple psychiatric hospitalization, primarily for detoxification and reinstutition of medications, but that he has had very few periods of prolonged sobriety.

(Tr 19) Additionally, the ALJ stated that "he has been through multiple substance abuse treatment programs but that he demonstrated poor follow-up after his care." (Tr. 19.) He also noted that one VA record noted that Plaintiff had "poor compliance" with his medications due to "enjoyment of the manic state and dislike of sexual side effects." (Tr. 20.) He also noted several occasions where Plaintiff was off his psychiatric medication immediately preceding a hospitalization. (Tr. 19-20.)

5

A claimant must follow treatment prescribed by his physician if such treatment will restore his ability to work. Failure to do so renders a claimant ineligible for benefits, unless there is a good reason for the failure to follow treatment. 20 C.F.R. § 404.1530 (1990). "A failure to follow a recommended course of treatment also weighs against a claimant's credibility." *Guilliams v. Barnhart*, 393 F.3d 798. 802 (8th Cir. 2005).

However, before finding that a claimant's noncompliance is willful, the ALJ must also consider the claimant's subjective ability to comply with the prescribed treatment, including an analysis of claimant's "social and psychological situation." *Tome v. Schweiker*, 724 F.2d 711, 714. (8th Cir. 1984). "[A] mentally ill person's noncompliance with psychiatric medications can be, and usually is, the result of the mental impairment itself and, therefore, neither willful nor without a justifiable excuse."*Pates-Fire v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009) (internal quotations omitted). According to the DSM, patients suffering from schizophrenia, schizoaffective disorder, and bipolar disorder also suffer from anosognosia, or poor insight. DSM IV-TR, 304, 321, 359 (4th ed. 2000). "Evidence suggests that poor insight is a manifestation of the illness, rather than a coping strategy. . . . This symptom predisposes the individual to noncompliance with treatment and has been found to be predictive of higher relapse rates, increased number of involuntary hospital admissions, poorer psychosocial functioning, and a poorer course of illness." *Id.*

This is not to say that a diagnosis of schizophrenia, schizoaffective disorder, or bipolar disorder automatically requires a finding of disability. But an ALJ's failure to address whether a claimant's failure to follow prescribed treatment is a manifestation of a claimant's schizoaffective or bipolar disorder has been found to support a remand in the Eighth Circuit. *Pates-Fire,* 564 F.3d at 946-47. *See also Kangail v. Barnhart*, 454 F.3d 627, 629 (7th Cir. 2006)("the fact that substance abuse aggravate[s] [a claimant's] mental illness does not prove that the mental illness itself is not disabling") (citing *Brown v. Apfel*, 192 F.3d 492, 499 (5th Cir.1999); *Sousa v. Callahan*, 143 F.3d 1240, 1245 (9th Cir.1998).) Further, if the ALJ

6

makes a finding of medical noncompliance without the benefit of medical evidence to support that finding, the ALJ has engaged in the forbidden practice of "playing doctor." *Pates-Fire*, 564 F.3d at 947-48.

In this case, Plaintiff has provided a wealth of medical evidence indicating that he suffers from mental impairments, including bipolar disorder. However, the ALJ failed to address and analyze to what extent Plaintiff's failure to follow prescribed treatment is a manifestation of his bipolar disorder

In his 2010 hearing, the Plaintiff testified that he has been hospitalized in a psychiatric ward "at least ten times." (Tr. 80. ) A thorough review of the voluminous and disordered record indicates that he has been hospitalized approximately nineteen times since 1995, primarily for mental illness and substance abuse. (Tr. 5004, 4041, 1649, 1644, 1642, 1639, 1636, 1633, 1622, 1611, 1318,1068, 1054, 441 431, 434, 427, 422, 420.) One VA record notes that he is "well-known" to hospital staff in the psychiatric ward for polysubstance abuse, substance-induced mood disorder, bipolar disorder, noncompliance, and Axis-II pathology. (Tr. 1855. ) The ALJ correctly noted that the majority of these hospitalizations occurred when he stopped taking his medications and relapsed on alcohol and/or drugs. A number of his hospitalizations involved suicidal ideation and/or overdoses. (*See e.g.* Tr. 5218, 5018, 1318, 1642, 1054, 1142,441, 420, 161.) However, there are also several instances where the medical records do not state that he was off his medications when he relapsed. (*See e.g.* 1640, 1628-29, 1622, 1611-12.) Invariably, he improved while an inpatient, but then relapsed upon discharge. There are at least six instances where he was rehospitalized within thirty days of discharge, including one reportedly within two days of discharge. (Tr. 1642, 1639, 1633, 1230, 1054, 441, 434, 427, 422, 420.) In one instance he reported relapsing with cocaine and alcohol within hours of discharge. (Tr. 431.)

He has also spent considerable time in residential substance abuse/mental health treatment facilities such as Gateway, Harmony House, Step Forward, the VA Domiciliary SAVE Program, and Genesis House. (*See e.g.* Tr. 2244, 1319, 441, 422.) He has been ejected from a number of these at one time or another for failure to make bed-check and relapsing with drugs and alcohol while in the program.

7

(*See. e.g.* Tr. 4000, 4086, 3979 3812, 2244, 2151, 480.) According to the notation of a Program Coordinator in 2007, "the veteran appears to have exhausted all options for VA programs." (Tr. 1612.)

Finally, during the periods between in-patient hospitalizations, Plaintiff's outpatient notes indicate repeated relapses with drugs and alcohol. One of his more notable relapses involved his stay at a monastery in Arkansas. According to the record, he borrowed the communal van to go to an AA meeting, but instead relapsed on whiskey while in town. (Tr. 1488.) According to his testimony, after he was ejected from the monastery he went "straight to a VA hospital in the psych ward."(Tr. 79.) Another notable incident included his being ejected from Gateway because he was calling drug dealers to his Gateway apartment. (Tr. 2244.) Another involved his being "permanently barred from St. Vincent's DePaul for selling whiskey by the drink to peers." (Tr. 1043.)

Thus, the record indicates an extremely persistent pattern of drug and alcohol relapses combined with inpatient, residential, and outpatient mental health and substance abuse treatment. Many, but not all, of these relapses occurred due to Plaintiff discontinuing his psychiatric medications. Despite this, the ALJ failed to address and analyze to what extent Plaintiff's failure to follow prescribed treatment is a manifestation of his bipolar disorder before using that failure to discredit his allegations.

On remand, the ALJ is directed to perform this analysis, utilizing the entire record and providing accurate page citations to facts relied upon. If necessary, the ALJ should further develop the record with information from a treating or examining physician which directly addresses this question.

      **B.**     **The ALJ Placed Too Much Weight on Two Non-Competitive Work Experiences and Lacked Any Form of Mental RFC From a Medical Professional Upon Which to Base His Assessment**

Citing instances of successful work in the past where the Plaintiff was presumed to be compliant with treatment, the ALJ found that "the claimant could function in a work environment where his contact with others is minimized. While the claimant's capacity to cope with, concentrate on and sustain persistence in completing tasks is limited, he should be able to complete simple, routine and repetitive

8

tasks and adhere to schedules." (Tr. 20.) The ALJ cited two specific work experiences in support of this statement during the periods of time between the Plaintiff's May 2008 hospitalization, his June 2011 relapse, and his April 2012 hospitalization. (Tr. 19.) These two experiences are as follows:

> VA records in March 2010 show that he was living with a friend in a travel trailer on the property where he worked and was getting along well. He reported that he was sleeping better since his Oxcarbazepine dosage changed and that Lorazepam was very helpful with anxiety. Records in November 2010 show that the claimant's mood was stable, that he was generally sleeping well at night and that he was working doing maintenance two to three days a week for the government subsidized housing complex where he lived. He reported he had been able to work off his fines and deposits and was active in his small Catholic church.

(Tr. 19-20.)

Unfortunately, when the full facts of these two work experiences are examined closely using the entire record, neither of them appear to have constituted any form of competitive employment.

In determining the ability of a claimant to perform SGA, the regulations and Agency policy ruling both distinguish between competitive versus sheltered and/or subsidized work environments. *See e.g.* 20 C.F.R. § 1574; SSR 83-33. Some of the factors that should be evaluated in determining if a claimant's work is being subsidized by a "benevolent" employer include the extent to which an employee does not fully earn his pay, how often the employee is absent from work, and if someone else does the employee's work when he is absent. SSR 83-33. In order for the ALJ to find that a claimant is capable of competitive employment "the test is whether the claimant has 'the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" *Id.* citing *McCoy v. Schweiker,* 683 F.2d 1138, 1147 (8th Cir.1982) (en banc).

Piecing together testimony and notes in medical records regarding the first work experience, it appears that Plaintiff lived for a period of time in a trailer on a ranch with a female friend. VA records on March 16, 2010 indicated that he and his friend had been living in the friend's son's house until the son asked Plaintiff to leave. (Tr. 5571.) His friend moved out as well and purchased a travel trailer for

them to live in on property where Plaintiff was working. (Tr. 5571.) At Plaintiff's January 2010 hearing, Plaintiff testified that was living with a female friend he had met while helping the SPCA with evacuated animals from New Orleans after a hurricane. (Tr. 67.) Ms. Wilburn testified that she had been with the SPCA and was now with a horse rescue. She testified that Plaintiff had been with her for about a year and a half and paid rent for a part of her place. (Tr. 85.)She worked on the ranch while Plaintiff stayed home with her three wolves to take care of them. (Tr. 87.) Plaintiff characterized this as "wolf-sitting." (Tr. 79.) She testified that he frequently did not do or didn't remember if he had done the care items he was supposed to do for the wolves, and when depressed would not do anything. (Tr. 86-87.) She stated that she had been an employer for other rescue organizations and that she would not have employed Plaintiff for very long in those situations. (Tr. 86.) VA records dated July 12, 2010, indicate that Plaintiff reported a lot of "drama" with his living conditions. He reported that "the woman he was living with while working on the ranch became angry with him and (unbeknownst to him) filed charges against him for domestic battery." (Tr. 5563.) He reported working out a deal with the court to have the charges dropped if he stayed out of trouble, moved out of the trailer, and left the horse ranch. (Tr. 5563.) Further details of how much he was paid for this work or if he was paid are not evident in the record.

Regarding the second work experience, an outpatient progress note on November 15, 2010 does indicate that Plaintiff reported a stable mood and was working 2-3 days per week doing maintenance in a government-subsidized housing complex. (Tr. 5541.) On February 18, 2011 he reported depression and one manic episode (when he ran out of trileptal). (Tr. 5534.) He was admitted for lung surgery in June 2011. (Tr. 5009.)In August 4, 2011, he reported worrying more and sleeping less after his lung surgery. He reported isolating himself and going for two days without sleep. He indicated that the apartment manager had been using her nephews to do the work he is supposed to be doing. (Tr. 5311.) On September 6, 2011 her reported "missing two weeks of work in the heat wave,

partly because of the heat and partly because he thought his landlady would call him when he needed to start work and she thought he just wasn't showing up." (Tr. 5303.) Plaintiff testified that he did this work until January 2011 when he had a seizure while cleaning in front of the "guy in charge" who was "married to the administrator." He was not permitted to help after that, he assumed for insurance purposes. (Tr. 120.) The only indication in the record of what this maintenance work consisted of was Plaintiff's testimony. He testified that he would help clean up apartments after tenants moved out, "mopping floors and all that." (Tr. 120.) He also appears to indicate that he did the work on a volunteer basis, stating "I started that voluntarily." (Tr. 120.) Further details of how much he was paid for this work, or if he was paid, are not evident in the record.

Thus, the first work experience relied upon by the ALJ consisted of Plaintiff staying at home to wolf-sit for friend who apparently rescued him along with evacuated pets from New Orleans. She testified that he did a poor job of wolf-sitting and this job ended with a criminal assault charge filed against him by that same friend. The second experience appears to have consisted of basic household cleaning activities performed on a sporadic basis in a position that was either volunteer, or where he could miss work without notice, or both. There are no details in the record of how Plaintiff was compensated, if at all, for either of these experiences.

Neither of these work experiences cited by the ALJ appear to constitute substantial evidence of Plaintiff's ability to engage in competitive employment.

Given Plaintiff's long history of mental illness and serious substance abuse difficulties, this Court is further troubled by the lack of a Mental RFC or any other assessment of Plaintiff's nonexertional functional capacity by a medical professional to support the ALJ's determination that Plaintiff was capable of competitive work. The Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001) Therefore, a claimant's RFC assessment "must be based on medical evidence that addresses the

11

claimant's ability to function in the workplace.'"'An administrative law judge may not draw upon his own inferences from medical reports."*Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000). Instead, the ALJ should seek opinions from a claimant's treating physicians or from consultative examiners regarding the claimant's mental and physical RFC. *Id.*; *Strongson v. Barnhart,* 361 F. 3d 1066, 1070 (8th Cir. 2004).

The only Mental RFC in the record was submitted by Plaintiff from Dr. Vann Smith. This was properly discredited by the ALJ because it was not supported by objective medical evidence and "extrapolated exclusively from a self-report from the claimant."[2] (Tr. 15.) It is unclear to this Court why neither Plaintiff nor Defendant obtained a mental RFC from one of the numerous VA institutions that Plaintiff has been treated at, either as an inpatient or an outpatient.

There are two medical evaluations by non-examining Agency physicians. Concerning Plaintiff's mental impairments, the first medical evaluation states that there is insufficient medical evidence of record to make a determination concerning Plaintiff's mental impairments. The second evaluation affirms the first one. (Tr. 2660-74.)The ALJ dismissed these due to later evidence obtained at the hearing level. (Tr. 20.)

The VA Discharge Summaries include a space on the form asking the date that the patient can return to full employment. The responses on these were mixed, with some indicating Not Applicable and others indicating he could work immediately upon discharge. (*See e.g.* Tr. 2797, 2791, 2782, 2779, 1662.) However, these statements do not indicate the scope of information generally given in a full Mental RFC, such as "the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." SSR 96-8p.

---

[2]*See also Flynn v. Astrue*, 2012 WL 6209990, *4 (noting that several courts have affirmed decisions where the ALJ gave little weight to or discounted the one-time examination reports of Dr. Vann Smith).

Thus, there is no mental RFC or other nonexertional capacity assessment remaining in the record from any medical professional. Plaintiff's Mental RFC assessment therefore must necessarily have been based on the ALJ's own inferences from the medical record.

On remand, the ALJ is directed to fully and accurately reference the record before utilizing any work experience as an indication of Plaintiff's ability of functional capacity to work. This will likely require further development of the record. Additionally the ALJ is directed to obtain a Mental RFC Assessment from a treating or examining psychiatric specialist. This Assessment must explicitly address the scope of information generally given in a full Mental RFC, such as "the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." SSR 96-8p.

### C. The ALJ's Finding That Plaintiff Was Malingering To Gain Shelter is Not Supported By Substantial Evidence

While again not expressly using this terminology, the ALJ appears to have discredited Plaintiff's allegations of mental impairment in part due to malingering or exaggeration for financial gain. Specifically he notes that "it was reported in August 2002 that the claimant was very manipulative and did not want to live on the streets." (Tr. 19.) He also noted that during his hospitalization in October 2003, his results on the MMPI-2 indicated a "highly elevated F-scale, consistent with over endorsement of symptoms in an apparent effort to draw attention to his perceived psychological distress. It was noted that he reported very extreme pathology which seemed somewhat inconsistent with his clinical presentation and that the possibility of secondary gain could not be ruled out." (Tr. 19.) He also noted a record that indicated that claimant "had not wanted to be discharged during past admissions, and that while he generally found reasons to stay, he did not really engage in the therapeutic milieu in a positive way." (Tr. 19.) Finally, the ALJ noted that VA records in May

13

2005 showed that "the claimant reported that he felt he might not benefit from a program, and that in reality, he would be going there for the housing and not for the program." (Tr. 19.)

An ALJ may discount a claimant's subjective complaints if there is evidence that the claimant was malingering or exaggerating for financial gain. *Davidson v. Astrue*, 578 F.3d 838,844 (8th Cir. 2009.) However, the ALJ "is [also] not free to ignore medical evidence that does not support his conclusion. *Reeder v. Apfel*, 214 F.3d 984, 988 (8th Cir. 2000) (ALJ's opinion did not discuss or discredit all diagnoses or limitations listed in medical records.) Nor may the ALJ selectively cherry-pick evidence in the record to support his preferred finding. *Taylor v. Barnhart*, 333 F.Supp.2d 846, 856 (8th Cir.2004) (citing *Confere v. Astrue,* 235 Fed. Appx. 701, 704 (10th Cir.2007) ("The ALJ is not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability")).Further, the regulations, Agency policy interpretation, and the Eighth Circuit all explicitly recognize that individuals with chronic mental impairments will commonly try to structure their lives "in such a way as to minimize stress" and thereby reduce their "symptoms and signs." 20 C.F.R. pt. 404, subpt. P, app. 1, 12.00(E); SSR 85-15; *Hutsell v. Massanari*, 259 F.3d 707, 711 (8th Cir. 2001.) .

While numerous notations were made concerning Plaintiff's reluctance to leave treatment, only one medical professional made one notation regarding the possibility of secondary gain in the entire 5,628 page record. The ALJ unfortunately neglected to discuss other key information which did not support his conclusion, thus providing an incomplete and inaccurate picture of Plaintiff's mental impairments.

For example, in the discussion of the 2003 MMPI-2, the ALJ failed to include the fact that the 2003 VA note in question also states that the testing findings "are consistent with the presence of bipolar disorder," although not specifically diagnostic for it. (Tr. 927.) The ALJ also failed to note the

14

results of another MMPI-2 instrument in 2004. Reference to over endorsement was also mentioned, with additional information:

> Results of the current assessment indicate that this veteran is experiencing a great deal of psychological turmoil. Although validity scales on both the MMPI-2 and PAI suggest that this patient may have responded to the tests in a manner that overrepresents or exaggerates the actual degree of psychopathology, *he has likely done so as a plea for help* for the marked distress that he is perceiving. Interpretations of the test results should be reviewed cautiously with the understanding that they are more indicative of this veteran's subjective experience of pain than of objective clinical symptomatology.

(Tr. 4483.)(emphasis added.) The complete 2003 information, as well as the 2004 summary, are consistent with Plaintiff's comments that he needs the safety and structure of a treatment facility: "It is one thing to go to meetings, attend groups, and be in a safe place like here in the hospital, but out there in the real world is a whole different thing. I just don't seem to be able to do it." (Tr. 1612.) The notes surrounding this comment state that "he had gained the tools" to deal with his drug and alcohol addictions, but "was unable to put [them] to good use." (Tr. 1612.) They are also consistent with some of the comments in the medical record, recommending that he be placed in a "[s]tructured, sober living environment," (Tr. 1719), or that indicate that he does best in a structured setting and when on his psychiatric medication. (*See e.g.* Tr. 734, 1319, 1487, 1877, 4484.)

Further, the ALJ only mentioned one overdose by Plaintiff, (Tr. 19.), when in reality there were a number of them, along with frequent suicidal ideation. A sampling of these include overdoses such as the one in July 2002, where he was admitted to ER for overdosing on 38 Lortab, 7 morphine, and several temazepam. (Tr. 1652.) Visible pill fragments were retrieved from his stomach, and "ODS showed presence of opiates and benzos." (Tr. 3651.) In August 2002 he was dispensed 120 Lortab and reportedly took them all over the weekend. (Tr. 1055.) On another overdose in February 2008, he was transferred to the acute psychiatric ward from LSU after he attempted to overdose. (Tr. 2061.) In April 2008 he overdosed on lorazepam. (Tr. 2247.) Suicidal ideation occurs frequently in his records. (*See e.g.* Tr. 5218, 5018, 1628, 1611,1054, 934, 441.)

15

Thus, it would seem that the bulk of the evidence indicates that the Plaintiff's reluctance to leave treatment is more an indication of a patient seeking a structured place to avert his chronic psychiatric symptoms than malingering for financial gain. Much of this medical evidence appears to have been ignored by the ALJ; instead he selectively cherry-picked facts from the record to support his finding that Plainitff was malingering.

### D. Necessity of Substance Abuse Analysis

Because the ALJ's finding of "not disabled" was unsupported by substantial evidence, it is not necessary to address whether the ALJ should have completed a substance abuse analysis at this time.

### IV. Conclusion

Accordingly, we conclude that the ALJ's decision is not supported by substantial evidence and should be reversed and remanded to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

DATED this 4th day of November 2014.

/s/ J. Marschewski

HON. JAMES R. MARSCHEWSKI

CHIEF UNITED STATES MAGISTRATE JUDGE

AO72A (Rev. 8/82)